WALTERSCHEIDT v. HLADIK
2022 OK 57
Case Number: 119049
Decided: 06/14/2022
THE SUPREME COURT OF THE STATE OF OKLAHOMA
Cite as: 2022 OK 57, __ P.3d __

 

NOTICE: THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL. 

IN RE THE GUARDIANSHIP OF: CONNIE WALTERSCHEIDT

KENT WALTERSCHEIDT, APPELLANT,
V.
CHRISTY HLADIK, APPELLEE.
APPEAL FROM THE DISTRICT COURT
OF KINGSFISHER COUNTY, STATE OF OKLAHOMA,
HONORABLE LANCE SCHNEITER
¶0 Husband filed a petition seeking appointment as guardian over his wife. The parties' daughter, Christy Hladik, objected and sought to have herself appointed. An evidentiary hearing was held on February 20, 2020. On July 27, 2020, the trial court entered the Court's First Amended Plan for Care and Treatment of Ward and Management of Property of the Ward. On August 10, 2020, the trial court appointed daughter as guardian over the person and property of Wife. Husband appealed, and on this Court's own motion, the matter was retained. After reviewing the record and briefs, we affirm the trial court's rulings.
TRIAL COURT ORDERS APPOINTING GUARDIAN AND APPROVING GUARDIANSHIP PLAN AFFIRMED
Grace K. Yates, Holmes, Yates, and Johnson Law Firm, Ponca City, OK, for Appellant
Randy J. Long, Long, Claypole & Blakely Law, PLC, Enid, OK, for Appellee
Frank Austin, Okarche, OK, for Ward
GURICH, J.
Facts & Procedural History
¶1 The hearing in this case was conducted on February 20, 2020. At the time, Husband and Wife had been married for nearly 34 years. During the entirety of this period, the couple resided on their family farm near the City of Hennessey, Kingsfisher County, Oklahoma, where Husband was engaged in a full-time farming operation. During their marriage, the Waltersheidts had two biological children together, Georgia Walterscheidt and Mary Milacek. In addition, Husband legally adopted Wife's child from a previous relationship, Christy Hladik, when she was five years old. Georgia and Christy are also residents of Hennessey, while Mary resides just north in nearby Waukomis, Oklahoma.
¶2 In addition to assisting in the farming operation, Wife was employed as a phlebotomist with Oklahoma Blood Institute for roughly twenty-five years. In approximately July of 2016, Wife began struggling with certain aspects of her work, including operating OBI equipment. On August 23, 2017, Husband took Wife to see a neurologist, Dr. Salomi T. Salins, to investigate her escalating memory problems. The records from this visit indicate that Dr. Salins did not believe Wife was suffering from dementia; rather, they suggest Wife was more likely experiencing depression, anxiety and possible marital difficulties. Dr. Salins referred Wife for additional testing and scheduled a follow-up appointment. In September or October 2017, Wife took time off from OBI and never returned to work. Wife again saw Dr. Salins with her daughter Christy in October 2017. Notes from that visit again reveal Dr. Salins had doubts that "[Wife] truly has a neurodegenerative disorder." Instead, Dr. Salins believed Wife was experiencing underlying depression. However, following a scan of Wife's brain, Dr. Salins' records from the following month denote that early onset Alzheimer's dementia was the probable diagnosis. Dr. Salins recommended further evaluations such as spinal fluid testing and a thorough neuropsychology assessment. She also encouraged Wife to apply for disability benefits; stop using the farm tractor; and limit any driving to familiar areas during daylight hours. At a one-year follow-up appointment, Dr. Salins documented a significant decline in Wife's cognitive assessment score.
¶3 Husband was not present for the November 9, 2017, appointment with Dr. Salins. However, Wife was accompanied by her sister Debbie Gritz. When Debbie dropped Wife off at the couple's home after the appointment, she informed Husband of the Alzheimer's diagnosis. Debbie also relayed Dr. Salins' instructions that Wife should no longer utilize farming equipment, drive on the highway, or drive at night. Husband became upset and asked Debbie to leave the property. She refused to leave and Husband told Debbie "[i]f [he] wasn't a gentleman, [he] might knock [Debbie] out." Despite the threatening statement, there was no evidence in the record that Husband had ever been physically violent with Wife or any other members of the family. In fact, the only evidence in the record relating to physical violence revealed an incident between Wife and Debbie, Christy, and Georgia. Debbie acknowledged a confrontation occurred between Wife and the three women after they attempted to discuss Wife's guardianship. During this episode, Wife became agitated and the women subdued her, which left bruising on the inside of Wife's arms. Debbie admitted that Wife did not want to discuss issues she felt were personal family issues with her sister and daughters, yet the group of women still physically detained her and forced her to discuss these matters. In addition to Debbie's testimony, Wife's injuries and the altercation were both documented in a DHS report.
¶4 The day before Dr. Salins made her preliminary diagnosis of early onset Alzheimer's dementia, Debbie took Wife to execute a Durable Power of Attorney, giving authority over Wife's affairs to Debbie and Wife's other sister, Vickie Elmer. The DPOA did not contain a clause nominating a guardian. Three days later, Debbie applied for Social Security disability benefits on behalf of Wife, and the application was later approved with an established onset date of September 2017. With Debbie's assistance, Wife opened a bank account at Central National Bank for the deposit of Social Security payments. Neither Debbie, Vickie, nor Wife informed Husband about the DPOA, the bank account, or that Wife had been approved for disability payments. Banks records indicate Social Security payments were deposited into the Central account beginning on April 25, 2018. 

¶5 At the end of 2018 and early part of 2019, Husband discovered the existence of Wife's Social Security disability payments, the Central National account, and the DPOA. By March 2019, there was more than $16,000.00 in Wife's account. Debbie withdrew most of the funds from the Central account in October 2019, because she believed Wife was attempting to make withdrawals. She deposited the money with a different bank and placed both her name and Wife's name on the account; additionally, Debbie removed Wife's ability to make withdrawals on her own.
¶6 Wife was again referred for an appointment with Sarah Coats, Ph.D., this time by Charles Ferrell, M.D. According to Wife's medical records, Dr. Ferrell asked Dr. Coats to evaluate Wife's cognitive status, including her competency to revoke the DPOA and her capacity to execute a new durable power of attorney. During the evaluation in April of 2019, Wife initially told Dr. Coats she had no recollection of executing the November 2017 DPOA. However, when interviewed alone, Wife said she remembered signing the DPOA but had no idea what was contained in the document. After interviewing both Wife and Husband and conducting testing, Dr. Coats reported that it was her professional opinion that Wife was not competent to revoke the DPOA. Dr. Coats noted that Wife's "dementia is significant enough at this point to impact competence;" she additionally felt Wife was no longer competent to manage her affairs, revoke her DPOA, or execute any new legal document. Dr. Coats recommend appointment of a legal guardian, explaining that based on the "complicated psycho-social stressors and apparent family discord . . . a legally appointed surrogate is recommended."
¶7 On September 26, 2019, Husband filed a petition seeking appointment as guardian over Wife's person and property. Christy objected to Husband's appointment and requested that she be named the guardian. In her objection and petition for appointment, Christy alleged that Husband was not fit to serve as Guardian because he was guilty of emotional abuse and repeatedly ignored doctor's orders and advice. Wife was represented separately by court-appointed counsel. Five witnesses were called to testify: Husband, Wife, Mary, Debbie, and Christy. 

¶8 Husband testified that he reluctantly filed for guardianship after discovering the DPOA, disability payments, and bank account. Husband noted that he did not learn about the DPOA until hospital staff brought the document to him while Wife was preparing to undergo a medical procedure in early 2019. He further testified that funds from Social Security disability were intended to supplement Wife's loss of income associated with her inability to work, yet Debbie's actions made them inaccessible to either Husband or Wife. Husband explained that for almost 34 years, he and Wife had "always been a team," and he had made a commitment to her in good times and bad. He further testified that he loved Wife and in the two years following Wife's diagnosis, the two have been almost inseparable. Together, they worked on their farm, fed the animals, babysat their grandson, and socialized in town. Husband testified that the pair have never been happier than they are now.
¶9 Husband did acknowledge he and Wife had a less than perfect marriage and at times the pair had yelled at each other. During direct examination, he denied being verbally abusive; however, he did concede that he and Wife "both holler[ed] at one another." All of the witnesses denied any physical violence between Husband and Wife. At the time of the hearing, Husband did not believe Wife was totally incapacitated. Medical records of both Dr. Salins and Dr. Coats suggested limiting Wife's use of farm equipment, but neither advocated total abstention from driving. Husband testified that it was not until January 2020 that Dr. Salins recommended Wife refrain from driving any vehicles. Although he had previously allowed Wife to continue driving farm machinery and help with farming operations until late 2019, Husband testified that he would prevent her from driving a car or farm equipment in the future based on the advice of Dr. Salins.
¶10 Wife testified unequivocally that she wanted to continue living on the farm with Husband and, if she were required to have a guardian, she would like it to be her Husband. Wife testified that she was no longer driving, but felt competent to do some house and farm work. Husband, Wife, and Christy all testified that they believed it was good for Wife to continue helping on the farm, taking care of her grandson, and socializing with her friends in Hennessey. Additionally, Wife's appointed attorney advocated for Husband to be appointed guardian because he also believed that it was in Wife's best interest to remain on the farm with Husband. Wife denied that Husband had been verbally abusive, but acknowledged that she and Husband both had gotten upset and raised their voices. Wife testified that she loves Husband and wants to remain at the parties' farm under his care. Further, she testified that Debbie forced her to execute the power of attorney, although Debbie and Christy both testified that Wife executed the DPOA voluntarily.
¶11 Mary testified that she did not have an opinion as to who should be the guardian of Wife's person; however, she thought Christy would be a better manager of Wife's finances. Mary, Debbie, and Christy believed that Husband had mismanaged some of the couple's finances in the past; however, there was no documentary evidence in the record to support that testimony. Mary spoke at length about an inadvertent phone call Husband made to Mary that was the primary incident used to support Christy's allegation of emotional abuse. During this call, Husband used offensive and disparaging language about the parties' daughters, Wife, and Wife's family. Mary testified that her parents have had arguments like that her whole life. She also testified that at the end of the call, she heard Wife say, "Give me the damn phone." After the phone call, Wife's daughters and Debbie confronted Wife about the call, and Debbie's daughter reported the incident to the Oklahoma Department of Human Services - Adult Protective Services. DHS conducted an investigation and issued a report finding merit to the allegations of verbal abuse and neglect; although, no action was taken by the State of Oklahoma. DHS also concluded that Wife was sufficiently competent to choose to remain in the marital home. Wife told the DHS caseworkers that she may be having some cognitive problems, but insisted she wanted to remain in the marital residence with Husband.
¶12 Debbie testified that she learned in November of 2017 that Wife was having blackout spells at work. Debbie further testified that while she and her sister were discussing Wife's problems, Wife said that she wanted Debbie and her sister to take care of her. Debbie stated that it was Wife's idea that she and her sister be appointed jointly to serve as Wife's DPOA. Debbie testified that she preferred Christy to serve as Wife's sole guardian. Nevertheless, Debbie wanted Wife to live with her and her boyfriend in Enid. Debbie testified that Husband was emotionally abusive, but admitted he was never physically abusive. To support her assertion of emotional abuse, Debbie pointed to prior statements from Wife, the accidental phone call to Mary, and the argument between herself and Husband regarding Wife's diagnosis. Nevertheless, Debbie admitted that Husband's anger toward her personally might have just been an emotional reaction to the news of Wife's Alzheimer's diagnosis. She testified that she has not been back to the Walterscheidt home since the incident, has had no contact with Husband, and did not know Wife's daily routines. While discussing the confrontation with Wife, Debbie admitted that the group of women grabbed Wife and bruised her arms. She said they were trying to make her listen, but Wife refused.
¶13 Christy testified that she and Husband have never been close, and she made the decision in 2011 to no longer have contact with him. She said that, in 2018, after the death of her brother-in-law, the family got closer again for a time. However, as Wife's condition progressed, Christy's relationship with her family worsened again. She also testified that after filing her objection to the petition for guardianship, her relationship with Wife deteriorated. Christy admitted that she had not been to the Waltersheidt home for close to two years preceding the guardianship case and did not know any of Wife's daily routines. She admitted that she chose not to seek a guardian appointment, until after Husband filed his petition, because she did not want to infringe upon her mother's liberties. When asked whether she could be co-guardian with Husband, she said yes as long as there were some checks and balances in place. Finally, she agreed that it would be beneficial for Wife to continue doing activities that are familiar to her. Additionally, she had no evidence to contradict Wife's testimony that she was happy with her life on the farm.
¶14 On March 2, 2020, Judge Schneiter notified the parties that he was going to appoint Christy as Wife's guardian, although no journal entry was filed at that time. On June 17, 2020, Christy filed a First Amended Plan for Care and Treatment of Ward and Management of Property of the Ward. On July 27, 2020, Judge Schneiter approved the plan, which provided that Debbie would be Wife's primary caregiver and that Wife would live with Debbie and Debbie's boyfriend in Enid. Additionally, visits between Husband and Wife would be only at the discretion of Christy, and visits would be limited to three times a week for one hour. On August 10, 2020, Judge Schneiter issued his three-page order memorializing his decision appointing Christy as guardian over the person and property of Wife. On August 24, 2020, Husband filed a motion requesting the trial court reconsider its final order. The trial court denied the motion and Husband initiated the present appeal. On the Court's own motion, this matter was retained. We find no reversible error and affirm the decision of the trial court.
Standard of Review
¶15 Appellant raises five assignments of error in this appeal. The issues raised concern both questions of law and fact. Factual disputes relating to the appointment of a guardian are reviewed for an abuse of discretion. In re S.A.H., , ¶ 11, 503 P.3d 1190, 1194. Trial courts are assumed to have used sound legal discretion, and their rulings will not be overturned absent an abuse of discretion. Gould v. Smith, , ¶ 8, 405 P2d. 82, 85. Further, "we reverse a guardianship order only if it is clearly against the weight of the evidence or contrary to law." In re Guardianship of Berry, , ¶ 61, , 799. Of course, questions of law are always subject to this Court's de novo review. Legarde-Bober v. Okla. State Univ., , ¶ 5, , 564. In exercising such a review, "this court possesses plenary, independent, and non-deferential authority to examine the issues presented." In re Estate of Foresee, , ¶ 8, , 865.
Analysis
¶16 Appellant first challenges the trial court's failure to follow the Wife's expressed preference to remain in Husband's care and custody at the family farm. In furtherance of this assertion, Appellant maintains that the trial court abused its discretion and erred as a matter of law by failing to follow Wife's expressed preference in the appointment of her guardian. Title states:
A. It is the purpose of the Oklahoma Guardianship Act to promote the general welfare of all citizens by establishing a system of general and limited guardianships for minors and for incapacitated and partially incapacitated persons which provides for the protection of their rights and the management of their financial resources. 
B. It is the purpose of the system of general and limited guardianships for incapacitated and partially incapacitated persons established by this act to provide for the participation of such persons, as fully as possible, in the decisions which affect them. It is the intent of the Oklahoma State Legislature: 
1. That the court shall exercise the authority conferred by the Oklahoma Guardianship Act so as to encourage the development of maximum self-reliance and independence of the incapacitated or partially incapacitated person and make appointive and other orders only to the extent necessitated by the mental and adaptive limitations or other condition of the incapacitated or partially incapacitated person warranting the procedure;
2. That in performing their duties and exercising their powers, guardians and limited guardians of incapacitated or partially incapacitated persons shall:
a. assure, to the extent reasonably possible, that the rights of the wards for whom they are appointed are protected;
b. encourage, to the extent reasonably possible, incapacitated or partially incapacitated persons to participate to the maximum extent of their abilities in all decisions which affect them and to act on their own behalf on all matters in which they are able to do so within the limitations imposed by the court; and
c. as appropriate, assist their wards to develop or regain to the maximum extent possible their capacity to meet the essential requirements for their health or safety, or to manage their financial resources or both. 
(Emphasis added).This language illustrates the Legislature's intent that even an incapacitated person should participate "as fully as possible" in making decisions that affect their life. However, the language of the statute also recognizes that full participation by an incapacitated person may not always be possible, or desirable, because of that incapacitated person's mental state or limitations on their ability to adapt. Therefore, the weight to give an incapacitated person's preference is largely discretionary with a trial judge and depends on an individual's capacity to offer a coherent explanation of their wishes.
¶17 This Court has previously set out guidelines for trial judges to consider when evaluating a ward's preference. In In re Guardianship of Holly, , , the ward was a partially incapacitated adult who wanted to replace his court appointed attorneys with his own nominated attorneys. The trial court refused to hear evidence of ward's capacity to hire his own attorneys and held that the nominated attorneys would not be allowed to represent Ward. Id. at ¶ 12, 164 P.3d at 141. On review, this Court invoked § 1-103(B) and reiterated that the "purpose of a guardianship is to allow the ward to participate, 'as fully as possible,' in the decisions affecting him." Id. at ¶ 23, 164 P.3d at 144 (quoting (B)). The Holly decision recognized that a ward's right to nominate his or her own counsel was fundamental. Id. at ¶ 24, 164 P.3d at 144. When such a nomination is challenged, a lower court must conduct "a meaningful evidentiary hearing to resolve the dispute." Id. at ¶ 23, 164 P.3d at 144.
¶18 Whether evaluating a ward's preference for appointment of a guardian or their choice of counsel, a trial court must thoroughly consider and settle such choice. When issuing a decree, courts should acknowledge a ward's desires. Although the trial court made no findings regarding Wife's preference to remain with Husband on the family farm, the trial court noted in the record on February 20, 2020, that "I know it's been extremely emotional for everyone involved, counsel and even those in the audience, as well for the Court." The Court went on to state:
I understand the importance of Connie remaining in the home, and I do understand that you all have been in a relationship for 34 years. I also have heard evidence today that there have been problems and whether it's denial, reluctance, or whatever the reason, there have been issues during the time from the diagnosis until today. And I have concerns about going forward about what's in her interest to make sure she's receiving the care she needs going forward.
When the decree is considered together with the statements in the record, it is reasonable to conclude that the trial court took into account the wife's preference in making his decision. 

¶19 The court's order appointing a guardian for Wife concluded she was incapacitated. By statutory definition, an incapacitated person is an impaired individual who lacks the capacity to provide for her own health or physical safety or is incapable of managing her own finances. A determination of incapacity does not ,however, automatically foreclose a ward from expressing his or her preference for a particular guardian, or participating in plans relating to his or her prospective care. .
¶20 Medical records suggested that Wife gave conflicting opinions about who she wanted to be her caregiver. In 2017, Dr. Salins recorded a note in Wife's patient file indicating Wife wanted her daughters and her sister to take care of her should she become incapacitated. Later records, however, reflect that Wife told her treating physicians she wanted to remain in Husband's care. Similarly, evidence in the record relating to Wife's competency was conflicting. Medical records indicated Wife was not sufficiently lucid to revoke her DPOA as of April 22, 2019; Dr. Salins indicated that Wife did not know the date, was unaware of the current President, and had a 0/5 recall score. Additionally, during the February 2020 trial in this case, Wife recalled her birthday of October 25, 1963, but estimated she was thirty-three years old. At other times, Wife's testimony appeared to reflect no cognitive deficit. Based on the conflicting record, it is difficult to discern whether Wife was sufficiently capable of participating in and providing input relating to the court's decisions affecting her future care and well-being.
¶21 We recognize and emphasize that the trial court was in a better position to evaluate Wife's demeanor and to assess Wife's abilities than an appellate court merely reading pages in a transcript. Berry and Berry Acquisitions, LLC v. BFN Properties LLC, , ¶ 19, , 1070. Further, we should not reverse an underlying judgment "for error in any matter of pleading or procedure, unless it is the opinion of the reviewing court that the error complained of has probably resulted in a miscarriage of justice, or constitutes a substantial violation of a constitutional or statutory right." (emphasis added). Because of the sensitive nature of the relationship between a husband and wife, the trial court should endeavor to provide findings to support deviations from a ward's expressed wishes to remain in a family home with his or her spouse. Nevertheless, we believe there was sufficient evidence in this case to justify the trial court's rejection of Wife's request to remain at home with Husband. Although nothing mandates an exhaustive recitation of the factual findings, the issues should be answered in a manner sufficient to allow a meaningful appellate review. Towne v. Hubbard, , ¶ 13, 3 P.3d at 159-60.
¶22 Next, Husband maintains the trial court erred by failing to follow the statutory preferences for appointment of a guardian outlined in the Oklahoma Guardianship and Conservatorship Act. In his third assignment of error, Husband alleges that evidence did not support the appointment of Christy Hladik as guardian, and that such appointment was clearly contrary to Wife's best interests. The Appellee does not dispute that the statute sets out a numeric list of individuals by priority, but argues that the trial court may exercise discretion and deviate from the list when taking into account the best interests of the ward. We deal with these two independent issues together. Title (A) provides:
A. The following priorities shall guide the selection by the court of a guardian or limited guardian of an incapacitated or partially incapacitated person from among those eligible:
1. The individual or individuals nominated by the subject of the proceeding pursuant to Section 3-102 of this title;
2. The current guardian or limited guardian appointed or recognized by the appropriate court of any other jurisdiction in which the incapacitated or partially incapacitated person resides;
3. An individual nominated by the will or by other writing of a deceased parent, spouse, or an adult child who was serving as the guardian or limited guardian of the subject of the proceeding;
4. The spouse of the subject of the proceeding;
5. An adult child of the subject of the proceeding;
6. A parent of the subject of the proceeding;
7. A sibling of the subject of the proceeding;
8. Any individual approved by the court with whom the subject of the proceeding has been living for more than six (6) months prior to the filing of the petition. Provided that any owner, operator, administrator or employee of a facility subject to the provisions of the Nursing Home Care Act, the Residential Home Care Act or the Group Homes for the Developmentally Disabled or Physically Handicapped Persons Act shall not be appointed guardian or limited guardian of a resident of such facility unless the owner, operator, administrator or employee is the spouse of the resident, or a relative of the resident within the second degree of consanguinity and is otherwise eligible for appointment; or
9. If applicable, an individual volunteer qualified for appointment as a guardian of a veteran pursuant to the Veterans Volunteer Guardianship Act. 
(Emphasis added).
¶23 Generally, the Legislature's use of the word "shall" indicates a statutory proviso is mandatory. Velasco v. Ruiz, , ¶ 9, , 1017-18. Subsection A of § 3-104 sets out a list of persons with priority for consideration by the court for appointment as guardian. The list ranks those with priority from 1 to 9. Although, § 3-104 provides that the priorities "shall guide" the trial court in making a selection for purposes of a guardianship, the use of the word "guide" or "guideline" does not render the term "shall" less obligatory. However, this does not end our inquiry, as § 3-104(C) qualifies the mandatory language of subsection A:
The court shall make reasonable inquiry to determine whether the person or organization proposed to serve as the guardian or limited guardian of an incapacitated or partially incapacitated person is suitable and will exercise the powers and carry out the duties and responsibilities of guardian or limited guardian in the best interest of the ward. The court shall also inquire of the proposed guardian of the person of the ward as to how the guardian proposes to provide for the care of the ward, and of the proposed guardian of the estate of the ward as to how the guardian proposes to manage the property of the ward and to provide for the ward's financial care. The court shall make such orders with respect thereto as the court deems to be for the best interest of the ward. 
(Emphasis added). Thus, § 3-104(C) equips a trial judge with discretion to deviate from the priorities in subsection A if a proposed guardian is either (1) unsuitable; or (2) unable or unwilling to exercise guardianship powers and carry out the duties and responsibilities of a guardian in the best interest of a ward.
¶24 To make sense, §§ 3-102 and 3-104 (A) and (C) must be read together as a whole. See Matter of Protest of Raytheon, , ¶ 10, --- P.3d --- (recognizing that "statutes regarding the same subject matter are read together, in an effort to give the intended effect to each related provision"). Trial judges should follow the priorities designated in § 3-104(A), unless the court determines there is a justification for denying the appointment of a proposed guardian with precedence. Title (A) directs:
A. The order appointing a guardian, based upon evidence adduced, shall set forth:
1. The determinations made by the court at the hearing;
2. The name and address of the individual, if any, appointed to serve as the limited guardian or guardian;
3. The specific limitations imposed upon the ward, if the ward is a partially incapacitated person;
4. Any authority granted a guardian of the person of the ward to change the place of abode of the ward outside of the state or county without the prior permission of the court; and

5. Whenever the court determines a review hearing is necessary or desirable, the date of the review hearing.
¶25 Although Wife executed a DPOA, it did not contain a nomination of guardian as authorized by . Likewise, § 3-104(A)(2) and (3) were inapplicable to this case. Yet, the final journal entry makes no mention of the trial judge's resolution of two of the most critical determinations in this case: (1) to disregard Wife's preference; and (2) to appoint Christy instead of Husband. In the case of Towne, ¶ 13, 3 P.3d at 159-60, this Court opined: 

A constitutionally unassailable guardianship proceeding must therefore include proper written notice, a hearing at which the prospective ward may appear and present evidence, the opportunity to confront and cross-examine adverse witnesses, a neutral decision-maker, representation by counsel, findings meeting a clear and convincing evidence standard, and a record sufficient to permit meaningful appellate review.
(footnote omitted & emphasis added).
Testimony from Husband, Wife, Debbie and Christy indicated that Husband and Wife had verbal altercations throughout the marriage. In addition, Husband demonstrated continued doubt over Wife's diagnosis. Further, Wife and Husband had limited contact with family members. Given the significant stress and work involved in caring for a dementia patient, the trial judge acted within his discretion in bypassing Husband in favor of Christy. There was sufficient evidence to justify the judge's deviation from §3-104. 

¶26 In his next assignment of error, Husband challenges the trial court's decision to place Wife in the custody and care of Debbie and her boyfriend and not the appointed guardian. Specifically, Husband maintains the trial court failed to conduct a background check on Debbie and her boyfriend as required by (A). Appellee Christy responds by arguing inter alia that the referenced statute applies to proposed guardians and not to a third-party custodian. Christy further maintains that Husband failed to raise this issue in his motion for new trial and thus the matter is not properly preserved. Contrary to Appellee's assertion, the issue was raised in Husband's motion for new trial.
¶27 First, Husband points to (A) in support of his argument that the trial court neglected to sufficiently examine the backgrounds of the court-ordered custodians. However, this section concerns the qualifications for an individual seeking to be a guardian. In the present case, Debbie is not the appointed guardian over Wife. Section 4-105 reads as follows:
A. In conducting an inquiry to determine whether a person is suitable to serve as a guardian, the court shall determine if:
1. The person proposed to serve as guardian is a minor or an incapacitated or partially incapacitated person;
2. The person proposed to serve as guardian and each adult member of the proposed guardian's household has a record of a criminal conviction, protective order, or pending criminal charge. When requested by the court, the petitioner shall present to the court an Oklahoma State Bureau of Investigation (OSBI) criminal background check for the proposed guardian and any adult household member evidencing no record of a criminal conviction in the OSBI criminal history repository based on the search criteria provided. The petitioner shall disclose the case name and status of any civil or criminal matter in state or federal court involving the proposed guardian or any adult household member of the proposed guardian;
3. The person proposed to serve as guardian is insolvent or has declared bankruptcy during five (5) years prior to the filing of the pleading proposing such person to serve as guardian;
4. The person proposed to serve as guardian is under any financial obligation to the ward; or
5. There exists a conflict of interest which would preclude or be substantially detrimental to the ability of the person to act in the best interest of the subject of the proceeding if such person is appointed.
B. No minor or incapacitated person shall be appointed guardian of an incapacitated or partially incapacitated person.
C. If the person proposed to serve has a criminal conviction, protective order, pending criminal charge, or other civil or criminal matter in state or federal court, the court shall make further inquiry into the nature of such conviction, order, charge or matter and the surrounding circumstances. The court shall appoint such person proposed to serve only upon determining that the facts underlying the circumstances do not give rise to a reasonable belief that the person proposed to serve will be unfaithful to or neglectful of the fiduciary and care responsibilities of the guardian, and that the appointment is in the best interest of the ward.
D. If the person proposed to serve as guardian or limited guardian of the property of an incapacitated or partially incapacitated person is insolvent or has declared bankruptcy within five (5) years prior to the filing of the pleading proposing that such person serve, the court shall appoint such person only after giving due consideration to the nature and extent of the property of the ward and the anticipated actions necessary to manage the estate of the ward, and only upon a determination that such appointment is in the best interest of the ward. Insolvency or bankruptcy shall have no effect on the qualification of a person proposed to serve as guardian or limited guardian of the person of an incapacitated or partially incapacitated person.
E. If the person proposed to serve as guardian or limited guardian of the property of an incapacitated or partially incapacitated person is under any financial obligation to the ward, the court shall make further inquiry into the nature and extent of such obligation. The court shall appoint the person proposed to serve only after a determination that such obligation will not impair the ability of the person proposed to serve to discharge the person's fiduciary responsibilities, and that the appointment is in the best interest of the ward. Being under financial obligation to the ward shall have no effect on the qualification of a person proposed to serve as guardian or limited guardian of the person of an incapacitated or partially incapacitated person.
F. A current or potential conflict of interest which is not substantial and not likely to preclude or impair the ability of a person proposed to serve as a guardian acting in the best interest of the person's ward shall not, by itself, disqualify such person from appointment.
G. Only a person who is a citizen or legal resident of or legally present in the United States of America shall be eligible to be appointed guardian of the property or person of a minor or an incapacitated or partially incapacitated person by the courts of this state, unless the court determines that there are no such qualified individuals available to serve as guardian and that it is in the best interest of the minor or incapacitated or partially incapacitated person to appoint a person without such qualifications.
¶28 This statute presupposes residential placement of a ward with the appointed guardian. Subsection 4-105(A)(2) applies to the adult members of the guardian's household and requires inquiry into any criminal convictions, protective orders, pending criminal charges, and any civil or criminal matters pending in state or federal court. Section 4-105(A) does not mention a third-party not residing in the guardian's household who assumes physical custody of a ward. Regardless, it is prudent for a trial court to conduct an inquiry into person's fitness as a caregiver and the legal qualifications of any proposed third-party custodian. The record is silent on whether the trial court conducted a personal background check on Debbie or her boyfriend. However, "legal error may not be presumed in an appellate court from a silent record. Absent a record showing otherwise, this court presumes that the trial court did not err." Hamid v. Sew Original, , ¶ 6, , 497. Because Husband has not provided anything in the record to demonstrate the custodians should be disqualified, we find no error in the trial court's approval of the guardianship plan.
¶29 Finally, Husband alleges the trial court erred by failing to hold an evidentiary hearing on the proposed plan. This proposition is without merit. The trial court was statutorily authorized to approve a proposed guardianship plan without conducting an evidentiary hearing. Title (A) provides:

A. If not filed with the petition or submitted to the court at the time of the hearing, within ten (10) days after his appointment the guardian or limited guardian of the person of an incapacitated or partially incapacitated person shall file with the court, for its approval, a proposed plan for the care and treatment of the ward and shall submit subsequent or modified plans as required by this title. Upon the application of the guardian or limited guardian, the court may extend the time for filing the plan for not more than thirty (30) days. The court may approve a plan acceptable to the court without notice or hearing or may, as necessary, order the modification of the plan at the initial review hearing.

Conclusion

¶30 Due to our aging population, families are increasingly faced with challenging situations, and many will rely on a court to make the most difficult decisions. A thorough record and a carefully explained final journal entry of judgment will assist those concerned in the resolution of the disputes, and will provided for a more effective appellate review. We conclude that the record supports the trial judge's actions and we find no abuse of discretion. The trial court's order appointing Christy Hladik as guardian over Wife's person and property is affirmed. The trial court's approval of the guardian's plan for care and treatment and property management of the Wife is affirmed.
TRIAL COURT ORDERS APPOINTING GUARDIAN AND APPROVING GUARDIANSHIP PLAN AFFIRMED
Kane, V.C.J., Winchester, Edmondson, Combs, Gurich and Kuehn (by separate writing), JJ., concur;
Darby, C.J., (by separate writing), concurs in result;
Kauger and Rowe (by separate writing), JJ., dissent.
FOOTNOTES
 Wife was eventually terminated by OBI on December 2, 2017.
 Records of Dr. Salins dated October 3, 2017, Objector's Exhibit 4, p. 5 of 24.
 Trans., Feb. 20, 2020, p. 38.
 Trans., Feb 20, 2020, p. 251-253.
 DHS Report, Exhibit 8, p. 4 of 47.
 April 2019 medical records from Sarah Coats, Ph.D., indicate that at the time she conducted her initial evaluation of Wife in December 2017, the examination did not sufficiently focus on Wife's legal competency to execute a power of attorney in the fall/winter of 2017. Thus, she could express no professional opinion as to the validity of the DPOA signed on November 8, 2017; however she did note that Wife "would have certainly been vulnerable to influence." Medical Records of Sarah Coats, PhD dated April 22, 2019, Exhibit 5, p. 9 of 10. Additionally, Wife was determined to be disabled by the Social Security Administration with an onset date of September 15, 2017.
 Trans., Feb 20, 2020, pp. 230-231.
 Wife was originally referred to Dr. Coats in December 2017 by Sarah Harmon, PA-C "for assistance with diagnosis and care planning regarding early onset dementia." Medical Records of Sarah Coats, PhD, dated April 22, 2019, Objector's Exhibit 5, p. 1 of 10.
 Medical Records of Sarah Coats, PhD, dated April 22, 2019, Objector's Exhibit 5, p. 8-9 of 10.
 Medical Records of Sarah Coats, PhD, dated April 22, 2019, Objector's Exhibit 5, p. 9 of 10.
 Debbie testified that she felt as though the money was Wife's, only to be used for her personal benefit, rather than payment of marital expenses. Trans., Feb 20, 2020, p. 229.
 Trans., Feb 20, 2020, p. 23.
 Trans. February 20, 2020, p. 226.
 Pursuant to (A)(1) and our decision in Christian v. Christian, , ¶¶ 7-8, , 943-44, Husband's motion was filed within ten days (excluding weekends) of the appealable order; thus, the time limit to initiate his appeal was tolled until disposition of his post-trial motion.
 The evidence in the record demonstrated that Wife was, at times, sufficiently lucid to express a desire to remain on the marital farm with Husband. When questioned about her preference, Wife understood where she had lived over the past thirty-four years and she expressed cogent reasons for wanting to remain at home.
 Trans. February 20, 2020, p. 297.
 Trans. February 20, 2020, p. 298.
 (A)(12) provides:
"Incapacitated person" means a person eighteen (18) years of age or older:
a. who is impaired by reason of:

(1) mental illness as defined by Section 1--103 of Title 43A of the Oklahoma Statutes,
(2) intellectual or developmental disability as defined by Section 1430.2 of Title 10 of the Oklahoma Statutes,
(3) physical illness or disability,
(4) drug or alcohol dependency as defined by Section 3--403 of Title 43A of the Oklahoma Statutes, or
(5) such other similar cause, and
b. whose ability to receive and evaluate information effectively or to make and to communicate responsible decisions is impaired to such an extent that the person:
(1) lacks the capacity to meet essential requirements for his physical health or safety, or
(2) is unable to manage his financial resources.
 et seq.
 In Hill v. American Medical Response, , ¶ 1, , 1123, this court upheld the mandatory use of guidelines established by the American Medical Association for assessing impairment for non-scheduled members set forth in , referencing the AMA Guides to the Evaluation of Permanent Impairment, Sixth Ed.
 This statutory section has been amended and, effective November 1, 2021, will require trial judges to issue factual findings relating to a ward's capacity to vote.
 See also, H.C.S. v. Cmty. Advocacy Project of Alaska, Inc. ex rel. H.L.S., 42 P.3d 1093, 1101 (Alaska 2002) (finding lower court erred by failing to issue specific findings addressing decision to deviate from guardianship priority statute), In re Estate of Runyon, 343 P.3d 1072, 1078-79 (Colo. Ct. App. 2014) (reversing order appointing guardian for failure to enter factual findings regarding ward's preference and deviation from statutory priorities).
 In the Court's First Amended Plan for Care and Treatment of Ward and Management of Property of the Ward, entered July 27, 2020, the court approved the guardian's request for the Wife to reside with her sister Debbie Gritz. Gritz lives with her retired boyfriend who was not named in the record. Trans. February 20, 2020, p. 296.
 For example, it would amount to an egregious abuse of discretion to place an adult ward in the physical custody of an individual who had a history of elder abuse.
 B. 1. The proposed guardianship plan and any subsequent guardianship plans for the care and treatment of the ward shall state:
a. the services which are necessary to meet the essential requirements for the physical health or safety of the ward taking into account the contents and recommendations of an evaluation report made with respect to the ward, if any;
b. the means for obtaining those services;
c. the manner in which the guardian or limited guardian, the ward, and the guardian of the property of the ward or the conservator, or if an organization or another person has been appointed to serve in that capacity, will exercise and share decision-making authority; and
d. such other services necessary to assist in fulfilling the needs of the ward, the terms of the most recent dispositional order applying to such guardian or limited guardian, and the duties of such guardian or limited guardian.
2. Each such plan shall be substantially in the following form:
Plan for the Care and Treatment of a Ward
I, _______________________, the (guardian, limited guardian) for (Name) (Name and the current place of abode of the ward) _________________________________________________ hereby submit this (initial, annual or as ordered by the court) Guardianship Plan for the care and treatment of said ward.
1. I believe the services necessary for the physical health and safety of the ward are: ________________________________________________________________
2. Those services will be obtained or provided as follows: ________________________________________________________________
3. The guardian (or conservator) of the property (Name or indicate as not applicable) of the ward, the ward, and I plan to cooperate and share decision-making authority with regard to the ward within the provisions of the dispositional order as follows: ________________________________ 
4. I believe the following services will assist in fulfilling the needs of the ward, implementing the terms of the most recent dispositional order applying to me as (guardian or limited guardian): 
_________________________________________________
Date (Signature of guardian or limited guardian)

C. If ordered by the court, the plan for the care and treatment of the ward shall be prepared with the assistance of any person designated by the court to provide such assistance. (emphasis added).

KUEHN, J., SPECIALLY CONCURRING:
¶1 Mrs. Walterscheidt is in need of a guardian. That fact is not contested. The limited questions before this Court are (1) whether the trial court erred in its interpretation of the law on how a guardian should be selected, and (2) whether the trial court abused its discretion making that selection. As the Majority notes (Opinion at ¶21), there is no statutory requirement for detailed factual findings on these issues. I believe meaningful appellate review is achievable here, and in the end, so does the Majority. We have a record of the evidence considered by the trial court, and we know the law it was required to follow.
¶2 The trial court did not abuse its discretion by failing to follow Mrs. Walterscheidt's stated desire, at the hearing, that Husband be appointed. The law does not require the trial court to abide by this desire, only to consider it. . We cannot forget the very reason guardianship proceedings were initiated here: Mrs. Walterscheidt's cognitive decline. The weight given to a mentally incapacitated person's preference is discretionary. Opinion at ¶16. As the Majority observes, the trial court was in the best position to evaluate the demeanor of all witnesses. We presume the trial court has done everything proper and necessary to support its judgment unless the contrary affirmatively appears. McFadyen v. Masters, , , 285 (1901). There is no suggestion that the trial court did not fully and faithfully consider Mrs. Walterscheidt's testimony.
¶3 The law also requires the trial court to consider candidates from a list of prospective guardians. (A). While that list appears to be in order of legislative preference, the law does not require the trial court to explain in detail why it passed over one candidate and chose another one lower on the list. Again, a trial court's decision on this issue is afforded discretion. It could be helpful if the court explained, on the record, the basis for its choice. But the presumption is that the trial court followed the law, and we review the evidence in the record to test that presumption.
¶4 Section 3-104(C) provides that the court "shall make reasonable inquiry" into whether a candidate is suitable. I believe that duty is discharged by allowing the parties to present relevant evidence. There is no statutory requirement that the court justify its reasoning. There is no evidence in this record that the person selected as guardian was unsuitable, or that the proposed living arrangements were unacceptable. Of course, any future concerns about these matters may be addressed to the trial court.
¶5 The guardianship order in this case is neither a protective order nor a divorce decree. It assigns no blame. It does not bar Husband and Wife from enjoying each other's company. It simply places the agency of one person in the care of another. The circumstances of our relationships change over time due to physical and mental infirmity; that is part of life. Guardianship orders are subject to modification as circumstances warrant. I agree that the trial court's decision was not contrary to the clear weight of the evidence, and that it was consistent with the applicable law.

Darby, C.J., concurring in result:
¶1 The majority correctly determines the trial court did not abuse its discretion and affirms. The Order Appointing Guardian was not clearly against the weight of the evidence or contrary to law. I remain concerned, however, that the majority opinion may leave readers less than sufficiently informed as to why.
¶2 It is right to review the trial judge's decisions for abuse of discretion. I acknowledge the judge did not adhere to the statutory priority list, did not grant Wife's most recent requests to remain on the family farm with Husband, and did not include findings of fact and conclusions of law in his order explaining in greater detail why he ruled as he did. But a review of the record, not just the Order Appointing Guardian, shows the judge's orders were neither contrary to law nor clearly against the weight of the evidence.
The Law
¶3 The trial judge provided as fully as possible for Wife's participation in the decisions affecting her. 30 O.S.2011, § 103(B). The trial judge's selection of a guardian was guided by the priority list in title 30, section 3-104(A), and the judge skipped over Husband in favor of Wife's sister because he determined it to be in the best interest of the ward. The trial judge made reasonable inquiries as required in title 30, section 3-104(C), (which applies to all guardianship appointments regardless of the priority list) and made such orders with respect thereto as he deemed to be for the best interest of the ward. 
¶4 The judge's order contained "[t]he determinations made by the court at the hearing" plus other particulars as required in title 30, section 3-113(A)(1). Wife did not nominate a guardian in the form required in title 30, section 3-102, therefore section 3-105 does not apply. The possible errors complained of did not probably result in a miscarriage of justice, or constitute a substantial violation of a constitutional or statutory right. . 
The Evidence
¶5 The majority opinion is far too kind to Husband and far too harsh on Wife's daughter and sisters in the rendition of the facts. I cannot join in describing the occasion when the Wife's daughter and sisters were attempting to talk to Wife about the guardianship and held her as "physical violence," a "confrontation," an "episode," or an "altercation." 
¶6 The three women were, in my estimation, trying to let Wife know what was going on and allow for her participation. These women, and Husband, have not been physically abusive to Wife. And to characterize what the daughter and sisters did as reflected in the Majority opinion is unfair and inaccurate.
¶7 The record also contains testimony concerning an incident when Husband inadvertently called Mary, who then heard remarks by both Husband and Wife. The majority opinion quotes Wife as saying at the end of the call, "Give me the damn phone." The opinion, however, only states, "Husband used offensive and disparaging language about the parties' daughters, Wife, and Wife's family." I'll say he did. Mary testified that Husband called Wife's family the "f***ing Gibbons" and called his wife of 34 years a "f***ing hag." When Debbie's daughter reported the incident, DHS conducted an investigation and issued a report which concluded among other things,
The allegations of caretaker neglect and verbal abuse are substantiated.
Self neglect is substantiated as Connie Walterscheidt chooses to stay in her home with Kent Walterscheidt while being subjected to verbal abuse by Kent Walterscheidt.
The trial court considered this evidence, and much more, before making the very difficult decision to appoint a guardian for Wife.
¶8 Only a review of the entire record gives this Court the information needed to review for abuse of discretion. And even such a review cannot duplicate the trial judge's in person observations during the trial.
¶9 The trial court followed the law and made decisions which were not clearly against the weight of the evidence. I respectfully concur in result only.

ROWE, J., dissenting:
¶1 Today's decision separates a wife from her husband, forces the wife to live with her sister and sister's unidentified boyfriend, and denies the couple the right of companionship -- which is tantamount to a judicially-foisted divorce. "Marriage is a coming together for better or for worse, hopefully enduring, and intimate to the degree of being sacred." Griswold v. Connecticut, 381 U.S. 479, 486, 85 S.Ct. 1678, 1682 (1965). The Oklahoma Legislature recognized the importance of the marital relationship when prioritizing a spouse over an adult child in the appointment of a guardian.
¶2 "Guardianship proceedings are regulated by statute, and failure strictly to comply with the statutory mandate may invalidate the appointment of the guardian." In re Guardianship of Deere, , ¶ 5, , 1125. The majority affirms the trial court's order appointing daughter as general guardian, despite holding that the same order does not comply with (A) as it fails to justify "two of the most critical determinations" the trial court made at the hearing: 1) the reason(s) why the trial court disregarded Wife's preference to remain with Husband in the home; and, 2) the reason(s) why the trial court appointed daughter over Husband contrary to the statute giving Husband priority.
¶3 The order appointing daughter fails to find Husband is unsuitable or unable or unwilling to be appointed -- the sole reasons permitted by (C) for the trial court to deviate from the statutory priority. The majority concludes that "any departure from these priorities should be explained with adequate factual and legal findings" but then concedes that "the trial court erred by not explaining his departures from the priorities." I would find that the trial court's failure to make these critical determinations is contrary to the guardianship statutes and constitutes an abuse of discretion.
¶4 The majority treats a proposed ward's right to nominate a guardian of her choice as a fundamental right. Like a parent's right of companionship of their children, "marriage is a constitutionally guaranteed fundamental right." Ramey v. Sutton, , ¶ 2, , 218. To protect a parent's right of companionship to a child, this Court requires identification of "the precise conditions" in judgments terminating parental rights based on failure to correct the conditions that led to the deprived adjudication. In re T.T.S., , ¶ 21, , 1030. To protect the fundamental marital rights at issue in this guardianship, the same conclusion should be reached about the absence of statutorily-mandated determinations in this trial court order, which effectively separates a wife from her husband of 34 years.
¶5 A guardianship proceeding poses the risk to the prospective ward of a massive curtailment of liberty. Towne v. Hubbard, , ¶ 12, , 159. In this instance, the trial court's order effectively deprives Wife and Husband's fundamental right to their marital relationship, a right protected by statutory safeguards. Accordingly, I respectfully dissent.